SOUTHEASTERN OIL DELAWARE, Inc.
v. UNITED STATES (two cases).

PACO TANKERS, Inc. v. UNITED STATES.

Nos. 48963, 48964, 49443.

United States Court of Claims.
Jan. 13, 1953.

Frank J. Zito, Washington, D. C., Robert S. Hope, J. Franklin Fort and Marvin J. Coles, Washington, D. C., on the briefs, for plaintiffs.

Ernest C. Baynard, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., for defendant.

Anthony N. Zock, New York City, Edwin K. Reid, New York City, on the brief, amicus curiae.

MADDEN, Judge.

The plaintiff companies purchased Liberty ship tanker vessels from the United States Maritime Commission, pursuant to the Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S.C.A.Appendix, § 1735 et seq. The vessels, as delivered to them, were not in a condition which entitled them to be certified by the United States Coast Guard for operation as oil carrying tankers. Without that certification, they could not be lawfully operated as tankers. The plaintiffs claim that the Maritime Commission, in determining the sales price of the vessels, should have granted them allowances, i. e. reductions in price, of the amounts which they would have to expend to put the vessels in condition to be eligible for certification by the Coast Guard for operation as tankers. They sue here for the amounts which, they claim, they should have been so excused from paying.

In our recent decision in A. H. Bull Steamship Co. v. United States, Ct.Cl., 108 F.Supp. 95, we discussed the objectives of the Merchant Ship Sales Act and such of its details as were there pertinent. Congress desired to get the Government's war-built merchant fleet into the hands of private owners and operators on terms fair to the Government and to the purchasers. It provided for formulas for determining the prices at which various types of vessels should be sold, the application of which formulas would, largely automatically, set uniform prices for the vessels. It desired that the vessels as sold should be operable. To be operable they had to be, according to the trade expression, "in class", that is, in condition to pass the inspection of the regulatory agencies of the Government whose certification of approval was necessary for lawful operation.

The original Ship Sales Act of 1946, after setting the formula for determining the statutory sales price of vessels, said, in Section 3(d) (1):

"If the Commission is of the opinion that the vessel is not in class, there shall be subtracted the amount estimated by the Commission as the cost of putting the vessel in class."

Section 12(a) authorized the Commission to itself cause the vessel to be reconverted or restored to make the vessel "suitable for commercial operation on trade routes or services or comparable as to commercial utility to other such vessels of the same general type."

The Commission apparently used the provisions of Section 12(a) rather than those of 3(d) (1). It thus spent appropriated funds on the vessels before they were sold. Congress, being unwilling to appropriate the necessary funds to continue that practice, enacted Public Law 269, 80th Congress, 61 Stat. 585, 603, approved July 30, 1947, which contained the following language:

*Provided,* That the Commission may make allowances to purchasers of vessels for cost of putting such vessels in class, such allowances to be determined on the basis of competitive bids, without regard to the provisions of the last paragraph of section 3(d) of the Merchant Ship Sales Act of 1946".

During the war, more than 2500 Liberty-type, dry-cargo vessels were built, 62 Liberty-type tankers and a smaller number of Liberty-type colliers. Section 3(d) (4) of the Merchant Ship Sales Act of 1946 contained this language:

"For the purposes of this Act,  *  * all Liberty vessels shall be considered to be vessels of one and the same type."

The pertinent legislative history seems to us to show that Congress intended that the Commission should take the normal Liberty ship, which was, of course, a dry-cargo vessel, as the type upon which the sales prices of all Liberty ships, including the small number of tankers and colliers should be computed, even though the actual cost of non-typical ships may have been larger.

Admiral Land, the principal witness for the Maritime Commission at the hearings at which the bills which emerged in the Merchant Ship Sales Act were considered, said:

"I think  *  *  * that all Libertys, whether cargo, bulk dry cargo, or tank-

ers (should) be of one type for price." Hearings before a Subcommittee of the Committee on Commerce, United States Senate, Seventy-ninth Congress, 1st Sess. on S. 292, September 14, 19, 25, 26, October 8, 9, and 12, 1945. Part 2, p. 106.

Senate Report No. 807, 79th Cong., 1st Sess., to accompany H.R. 3603 which became the Merchant Ship Sales Act, said at page 13:

"Certain arbitrary provisions with respect to estimating prewar and war costs are included in the pricing provisions. It is provided that all Libertys are to be considered as one type so that Libertys built or converted as colliers or tankers are priced under the same plan as the regular dry-cargo vessel."

House Report No. 1526, 79th Cong., 2d Sess. to accompany H.R. 3603, which report was the conference report, said, at page 13:

"The conference bill adopts the former provision, thereby including Liberty tankers under the pricing provisions generally applicable to Liberty-type vessels * * *."

The Maritime Commission interpreted the quoted provision as we have interpreted it, and determined the statutory sales price of all Liberty ships accordingly.

The plaintiffs, among others, made applications for Liberty-type tankers under the provisions of the Merchant Ship Sales Act. On October 29, 1947, the parent corporation of the plaintiff Southeastern, in whose shoes that plaintiff now stands, applied for such tankers. On November 7, 1947, the plaintiff Paco made a similar application. Both applications showed that the applicants intended to use the ships in the tanker trade. The Commission approved the applications and allocated to Paco two Liberty-type tankers, the S. S. William E. Pendleton and the S. S. Oscar F. Barrett. It allocated to Southeastern the S. S. Henry L. Ellsworth, the S. S. Jacob Thompson, and, at a later date, the S. S. Christopher L. Sholes and the S. S. Richard J. Cleveland. Paco signed its contract for the purchase of its two ships on December 16, 1947. Southeastern signed its contract for the purchase of the Ellsworth and the Thompson on February 3, 1948, and its contract for the Cleveland and the Sholes on February 26, 1948. Pertinent parts of the contracts are quoted in our Finding 21. The contracts referred to the provisions of Public Law 269, quoted above, and said that the Commission would:

"* * * reduce the purchase price of the vessel by an amount equal to the cost, as determined by the Commission which would be required for the purpose of enabling the Commission to deliver the vessel to the Buyer in class with valid certificates of classification and inspection in accordance with the minimum requirements of the American Bureau of Shipping and the United States Coast Guard, Marine Inspection, rules and regulations outstanding as of the class date, hereinafter defined, * * *. The class date shall be the date of the execution of this agreement, * * *."

The usual practice of the Commission in determining the allowances to which a purchaser was entitled is described in Finding 23. In brief, the Commission and the purchaser examined the vessel with care to see what needed to be done to it which the purchaser was entitled to have done at the Commission's expense. After the purchaser had had the work done and showed what the actual expense was, the allowance would be computed. During the period of inspection of the vessels, representatives of the Coast Guard examined the vessels and made reports to Paco representatives. But they said nothing about non-compliance with Section 32.2-5 of the Coast Guard Rules pertaining to the fireproofing of tanker vessels, which rules had been published in the Federal Register in 1936. The cited rule said:

"Living Quarters—TB/ALL Partitions and sheathing shall be of approved fire-resistive construction."

The pertinent events with regard to the inspection of the vessels purchased by Southeastern were substantially the same as those concerning Paco. Substantial allowances were authorized on the vessels purchased by both plaintiffs, but nothing

398

was allowed for the fireproofing which is in question in these suits.

The question of allowances for fireproofing having been raised, the Commission on March 11, 1948 ruled that no purchaser of a Liberty tanker would receive an allowance for that expense. It tentatively decided that no bills of sale would be issued on such vessels unless the purchaser would waive, in writing, any right to such an allowance. However, on March 26, 1948, after having heard argument of counsel for the plaintiffs, the Commission recanted and directed that purchasers should not be required to waive their claims in that regard. Thereafter the Commission and its successor, the Maritime Administration inserted in contracts for the sale of Liberty-type tankers a clause expressly reserving such claims.

We now discuss the history of fireproofing and its absence in Liberty-type tankers. Because of the necessity for speed in construction, and the scarcity of steel during the war, the Maritime Commission, beginning late in 1942, requested the Coast Guard to relax, for Liberty-type tankers, its published requirements for the fireproofing of tankers, one item of relaxation being the continued use of plywood instead of sheet metal for partitions and other purposes in the crew's quarters. The Coast Guard, as it had the power to do, consented to the relaxation, but said:

"this office will approve this type of construction for the duration of the present national emergency with the understanding that at the termination of this emergency these vessels will either be converted for dry-cargo service or all necessary alterations will be made to secure strict compliance with the rules for tank vessels."

In 1943 some fifty-seven and in 1944, five, Liberty-type tankers were constructed in two shipyards, one in New Orleans and one in Los Angeles. Coast Guard headquarters did not publish its action in the Federal Register and advised only those District Offices of the Coast Guard having jurisdiction over those two ports, of the relaxation of its rules. But as the vessels were

completed, and each year thereafter, as they became due for annual inspection, they were examined by Coast Guard inspectors, presumably in any Coast Guard District where they happened to be, and were issued certificates of inspection permitting them to sail. Both the plaintiff Paco and the parent corporation of the plaintiff Southeastern operated Liberty-type tankers as general agents of the Maritime Commission during and after the war.

It will be remembered that the plaintiff Paco made its application for Liberty-type tankers on November 7, 1947, and, its application having been approved, signed its contract on December 16, 1947, for the purchase of its two ships. The plaintiff Southeastern made its application on October 29, 1947, and signed its contract for two of its ships on February 3, 1948, and for its other two ships on February 26, 1948. On February 20, 1948, the Commandant of the Coast Guard instructed all District Coast Guard offices that no waivers of Coast Guard Tanker Rules should be extended, for Liberty-type tankers, beyond March 31, 1948. He said that when the relaxation of the rules had been granted, the Maritime Commission has said that the deficiencies in these vessels would be corrected at the first practicable opportunity, and that with the return of the Merchant Marine to peacetime operation, the vessels should be brought into full compliance. On March 12, 1948, the Commandant issued an order that no certificates of inspection could be issued on Liberty-type tankers unless the certificates stated that the waiver of the rules would expire on March 31, 1948. Pursuant to this order, the plaintiffs were allowed, temporarily, to operate their tankers without complying with the rules for fireproofing.

In October and December, 1947, prior to the date of the plaintiffs' contracts to purchase their ships, Mr. W. G. Allen, Engineering Assistant to the Chief of the Tanker Division, Bureau of Operations, of the Maritime Commission, conferred with the officers of the Bureau of Marine Inspection and Navigation of the Coast Guard, seeking information as to what was to be done to have the Liberty-type tankers comply with

Coast Guard regulations, and asking for a list of the deficiencies. Mr. Allen was advised that fireproofing requirements "appear to be applicable to the subject vessels for peacetime operation."

■ As we have seen, the contracts between the Maritime Commission and the plaintiffs for the sale and purchase of the tankers here in question provided that the purchase price should be reduced by the amount necessary to put the ships "in class" with valid certificates of classification and inspection in accordance with the minimum requirements of the United States Coast Guard, Marine Inspection, rules and regulations outstanding. Assuming, for present purposes, that our question is one of interpretation of the contract, we must determine whether the fireproofing rules of the Coast Guard were "outstanding" as of the dates of the contracts. Those regulations had been promulgated in 1936; they had been relaxed in 1943 to enable the Maritime Commission to meet the exigencies of the war, and upon the understanding that the vessels constructed under the relaxation of the rules would be brought into compliance at the termination of the emergency; the emergency had long since terminated; the Maritime Commission had, upon its inquiry, been advised that, for peacetime operation, the rules appeared to be applicable; the Coast Guard inspectors had not, in fact, enforced the rules. In the circumstances, we think the Coast Guard's fireproofing regulations were "outstanding" within the meaning of the contracts. The Maritime Commission should have known that the most that any private purchaser could get in the way of a certificate of inspection would be a revocable license to operate the ships at the grace of the Coast Guard, and would be constantly faced with the expense of bringing the ships into compliance with the regulations. The contract provision as to putting the ships in class could not have been intended to be so precarious an assurance that the ships were lawfully operable. When we consider further the objectives of the Merchant Ship Sales Act of 1946, one of which was to sell Government ships to private purchasers in operable condition, we think that that objective would have been defeated by selling a ship which, as the Maritime Commission should have known, might not be permitted to operate at all.

It is urged that the plaintiffs knew that the ships they bought did not comply with the Coast Guard regulations, and that they did not claim, during the time that allowances were being computed, allowances for the expense of fireproofing. It may be that they assumed that, since the Coast Guard had, during the war and long after it, certified the ships without question, that it would continue to do so during the life of the ships. They did not know of the condition which the Coast Guard had attached to its relaxation of its rules, in its correspondence with the Maritime Commission in 1943. They did not know that the Coast Guard had told the Maritime Commission in 1947 that its fireproofing regulations were applicable to the ships in peacetime operation. The conduct of the Government's Coast Guard inspectors in continuing to issue certificates to the ships long after the emergency had passed indicated the contrary. But the regulations were, in fact, outstanding, as to their operation of the ships, and their lack of diligence in not inquiring more carefully into the question does not deprive them of their rights under the contract, and, we may add, under the statute.

As shown in our Findings 40–42, the Maritime Commission's representative required Southeastern to sign certain documents before delivery of three of its ships, which documents might be construed as an attempted waiver by Southeastern of any further claims for allowances with regard to those ships. But the Commission's representative testified that the documents were not intended as waivers of any of the purchaser's rights under the Ship Sales Act or the contracts. We need not, therefore, consider what would have been the legal effect of such an attempted waiver, if one had been intended.

The Government urges that the Maritime Commission could not, in its contracts, have agreed to grant an allowance for the cost of fireproofing the tankers, because it

had no statutory authority to do so. It says that the provision in Section 3(d) (4) of the Merchant Ship Sales Act that "For the purposes of this Act, * * * all Liberty vessels shall. be considered to be vessels of one and the same type", as interpreted and applied by the Maritime Commission, made the dry-cargo Liberty the typical Liberty ship, and that the Commission could not, therefore, make a class allowance for any purpose other than to put Liberty vessels in a class as dry-cargo vessels. It says that the Commission might have, and perhaps should have interpreted the language quoted above as merely removing Liberty tankers from the requirements of Section 3(d) and 3(d) (4) of the Act which fixed higher percentages of pre-war domestic cost and domestic war cost for tankers than for other vessels. According to this suggestion, the Commission might have treated Liberty tankers as non-tankers, in determining what percentages to apply, but still have applied the dry-cargo vessel percentages to the actual higher cost of Liberty tankers, rather than, as it did, to the lower cost of Liberty dry-cargo vessels. If it had acted according to the Government's present suggestion, the floor price of the plaintiffs' tankers would have been $103,299 more than the plaintiffs paid for the vessels. Thus, urges the Government, the plaintiffs obtained a financial advantage by. having their tankers treated as if they were what they were not, i. e. dry-cargo vessels, and cannot, with consistency, claim that they should be allowed the cost of putting them in class as tankers.

■ We think the Maritime Commission, in not only applying the dry-cargo ship percentages to the Liberty tankers, but in pricing the small number of Liberty tankers the same as the large number of Liberty dry-cargo ships, was carrying out the intent of Congress. We have cited above the pertinent legislative history. If, then, the plaintiffs were charged $103,299 less for their ships than they would have been charged under some other pricing formula, it was because Congress so fixed the price. And it did not create in the Government an equity entitling it to narrow down some

other right to which the statute entitled the plaintiffs.

We consider now the. Government's contention that, since the Maritime Commission, being required by the statute to consider all Liberty vessels as being of one type, naturally adopted the Liberty dry-cargo vessel as that type, it was not required nor, indeed, permitted, to grant a class allowance to put a Liberty vessel in class except in the class of the type, i. e. the dry-cargo Liberty. There is a certain plausibility in the argument, but it collides with the realities. As we have said, Congress desired to put the surplus ships in private hands for operation, and to, by class allowances, make it possible that they be put in operable condition. These ships were tankers. Congress knew that there were a small number of Liberty tankers and colliers. That is why it said what it did about considering all Liberty ships to be of the same type. We do not know whether a Liberty tanker, not eligible for certification as a tanker because of the absence of fireproofing, could be certified for the carrying of dry cargo. But we know, and Congress knew, that no one in his right mind would buy such a ship for such a purpose. Are we to assume, then, that when Congress used the language which it used about types of ships, and putting ships in class, that it intended that all ships should be sold as operable ships, except Liberty-type tankers? We suppose, rather, that no ship was to be sold unless it was operable as the kind of ship that it was in fact, whether dry cargo, collier, or tanker.

The plaintiffs are entitled to recover. The question of the amount of their damages will be determined after a further hearing before a Commissioner of the Court.

HOWELL, Judge, and JONES, Chief Judge, concur.

WHITAKER, Judge (dissenting).

I cannot agree with the opinion of the majority. It seems to me that it treats the vessels sold as the "standard" Liberty-type vessel for the purpose of ascertaining the statutory sales price, and then treats it,

not as a standard vessel, but as a special sort of vessel for determining the adjustments necessary to put the vessel "in class."

The Ship Sales Act of 1946, 60 Stat. 41, was passed for the purpose of fixing a uniform basic price for the sale of all vessels of the Maritime Commission which were of the same type. This statutory sales price was based on the prewar domestic cost of a "standard vessel", section 3(c). The statutory sales price was to be 50 percent of the prewar domestic cost of a dry-cargo vessel, but 87½ percent of the prewar domestic cost of a tanker. However, it was provided in the last paragraph of section 3(d) (4) that "For the purposes of this Act, * * * all Liberty vessels shall be considered to be vessels of one and the same type." The vessels sold to plaintiffs were Liberty-type tankers.

In section 299.1 of General Order No. 60 of the Maritime Commission it was provided in subsection (f) that the " 'statutory sales price,' as applied to a particular vessel, means, in the case of a dry-cargo vessel (as defined in paragraph (c) of this section), an amount equal to 50% of the prewar domestic cost of that type of vessel." Within this definition of a dry-cargo Liberty vessel comes a Liberty-type tanker, because in subparagraph (c) of that section it is provided that "the term 'dry-cargo vessel' includes a Liberty-type tanker * * *."

As the Court found in finding 13, the " 'standard' Liberty-type vessel was the basic Liberty-type, dry-cargo vessel," and the prewar domestic cost of all Liberty-type vessels "was made without considering the cost of any of the modified Liberty-type vessels." The Court also found in finding 14:

"The Liberty-type vessels, converted to emergency tankers, cost more to build than the basic Liberty-type, dry-cargo vessel, their average cost being $1,995,000. The five tankers built in 1944 each cost $2,056,525. Their estimated prewar domestic price was $1,-518,000 each. This extra cost was not reflected in any of the prices published in General Order No. 60. The Commission chose the basic Liberty-type,

dry-cargo vessel as the 'standard' vessel for all Liberty-type vessels and offered the modified vessels, as well as the basic Liberty-type, dry-cargo vessels, for sale at prices estimated and determined on the basis of the cost of the 'standard' Liberty-type, dry-cargo vessel.

\* \* \* \* \* \*

"On the basis of this provision and the fact that there were over 2,500 Liberty-type, dry-cargo vessels, and 62 tankers, only 5 of the latter being delivered in 1944, and which could have been used in the cost base, the Commission (1) chose the Liberty-type, dry-cargo vessel as the 'standard' vessel, (2) determined the statutory sales price for all designs on the basis of the cost of this 'standard' vessel, (3) defined the Liberty-type tanker as a dry-cargo vessel in General Order 60, (4) sold all designs at these prices, and (5) made no determinations, insofar as the sale of the modified designs was concerned, that the tanker equipment on the tankers constituted 'desirable features' under Section 3(d) (3) of the Act."

Accordingly, the "statutory sales price" of the vessels sold to plaintiffs, although tankers, was fixed upon the basis of the prewar domestic cost of a dry-cargo Liberty-type vessel. That it was a tanker and cost more to construct than a dry-cargo vessel was disregarded; it was treated as a dry-cargo vessel.

The Ship Sales Act in section 3(d) (1) provides that from the "Statutory sales price" there shall be deducted the cost of putting the vessel "in class." The Act contemplated that the vessels should be sold on the basis of the cost of a standard vessel, and, hence, if the vessel actually sold was not in condition to pass inspection, which is to say was not "in class," the cost of putting it "in class" was to be deducted from the price. But, since the sales price was fixed as if the vessel was a dry-cargo vessel, then the cost to be deducted was the cost of putting it "in class" as a dry-cargo vessel.

What the plaintiffs are suing for in this case is the cost of fireproofing the vessels.

sold plaintiffs. Hence, the question is, was this fireproofing necessary in order to put a standard Liberty-type vessel "in class." As stated, a standard Liberty vessel was a dry-cargo vessel; it was not necessary to fireproof such a vessel in order to put it "in class." Fireproofing was necessary only where the vessel was used as a tanker. Therefore, since the statutory sales price was not based on the prewar domestic cost of a tanker, but was based on the prewar domestic cost of a dry-cargo vessel, plaintiffs are not entitled to the cost of fireproofing, because this was not necessary to put a dry-cargo vessel "in class."

It is incongruous to treat this vessel as a dry-cargo vessel for determining the statutory sales price and to treat it as something different for the purpose of determining what was necessary to be done to put it "in class." Since it was not necessary to fireproof it to put it "in class" as a standard dry-cargo vessel, the plaintiffs, in my opinion, are not entitled to this cost.

LITTLETON, Judge, joins in the above dissent.